# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

WILLIAM WOLFE,

                Plaintiff,

v.

IDAHO DEPARTMENT OF CORRECTION; BRENT REINKE; CORIZON MEDICAL SERVICES; RANDY BLADES; DR. WHINNERY; and ALL MEDICAL CARE PROVIDERS CONNECTED TO THE PLAINTIFF'S HEALTH,

                Defendants.

Case No. 1:13-cv-00227-EJL

**MEMORANDUM DECISION AND ORDER**

Pending before the Court in this prisoner civil rights case is Defendant Corizon's Second Motion for Summary Judgment. (Dkt. 28).[1] Also pending is Plaintiff's Motion to Strike. (Dkt. 31). The Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d). Having carefully reviewed the record, and otherwise being fully informed, the Court enters the following Order.

---

[1] Defendant Corizon filed its initial motion for summary judgment on May 20, 2014. (Dkt. 17). The Court denied this motion without prejudice because Corizon had failed to provide appropriate document and page citations for its extensive discussion of the voluminous medical records in this case. (Dkt. 27). Corizon subsequently refiled its corrected brief and motion pursuant to the Court's order. (*Id*. p. 6.)

**MEMORANDUM DECISION - 1**

# BACKGROUND

Plaintiff William Wolfe is a prisoner in the custody of the Idaho Department of Corrections, currently incarcerated at the Idaho State Correctional Institute ("ISCI") in Kuna, Idaho. Defendant Corizon Medical Services ("Corizon") is a private entity that contracts with the Idaho Department of Corrections to provide medical care to inmates in the State of Idaho. (Dkt. 28-1 at p. 4, & IRO, Dkt. 7, at p. 3). Wolfe alleges a violation of 42 U.S.C. § 1983 and the Eighth Amendment to the United States Constitution, arguing that prison officials improperly delayed medical treatment after he was diagnosed with prostate cancer in 2012. Among other things, Wolfe alleges that the cancer would not have spread to his lymph nodes had he undergone surgery to remove his prostate in a more timely fashion, and also that Corizon improperly delayed radiation therapy after the spread of the cancer was discovered. The critical facts are as follows.

On March 23, 2012, Wolfe was seen by a physician's assistant at the Idaho State Correctional Institution for a routine physical. (Dkt. 17-7 at 18). This physical included a digital examination of the prostate and a blood draw to check for elevated PSA levels. (Affidavit of Catherine Whinnery, MD. Dkt. 17-6, ¶ 4). The Physical examination of the prostate revealed no abnormalities, but on April 4, 2012, the results of the blood draw showed elevated PSA levels of 6.26 (levels of less than 4 are considered normal). (Dkt. 17-8 at 5). The ISCI physician's assistant discussed the elevated PSA level with Wolfe on April 18, 2012, at which time it was noted that he would be sent to a urology specialist for further evaluation. (Dkt. 17-9 at 4 & 24).

**MEMORANDUM DECISION** - 2

Wolfe was seen by a urologist, Dr. John Greer, on June 27, 2012. In an office note from that visit, Dr. Greer indicated that Wolfe should "proceed with prostate ultrasound with possible biopsy." (Dkt. 17-5 at 13). On June 28, 2012, Dr. Catherine Whinnery, an ISCI family practice physician who was part of Wolfe's medical team, requested approval of the ultrasound and biopsy through the Corizon utilization review process. Corizon approved these procedures, respectively, on July 8 and July 23, 2012. (Whinnery Aff. ¶ 9).

Dr. Greer performed the ultrasound and biopsy on August 22, 2012. On August 27, 2012, the pathology report was returned, revealing the presence of cancer. (Dkt. 17-5 at p. 17-18). The pathologist assigned Wolfe a Gleason Score of 8, indicating that his cancer was aggressive in nature. (*Id.*). On September, 10, 2012 Wolfe underwent a CT scan of the abdomen and pelvis and on September 26, 2012 he underwent a whole body-image bone scan. The purpose of these scans was to determine whether his cancer had spread beyond the prostate. (Dkts. 17-5 at 19 & 22-23). Both these scans revealed no evidence of metastatic disease. (*Id.*).

On October 15, 2012, Wolfe met again with Dr. Greer to discuss treatment options. This discussion addressed the risks and benefits of surgery versus radiation therapy as possible avenues of treatment of his cancer. According to Dr. Greer's office note, at that time, Wolfe had no interest in radiation therapy and instead opted for surgical removal of the prostate. (Dkt. 17-5 at 24-25). This surgery was ultimately performed on November 19, 2012. On November 21, 2012, the surgical pathology report revealed that, contrary to the indications provided by the pelvic CT scan and bone scan,

**MEMORANDUM DECISION** - 3

Wolfe's prostate cancer had in fact spread to two of his pelvic lymph nodes. (Dkt. 17-5 at 31-33). Wolfe was seen in follow up by Dr. Greer on November 27, 2012, at which time he was advised that he would need radiation therapy to keep the cancer from recurring. (Dkt. 17-5 at 39).

Wolfe was seen by a radiologist, Dr. Timothy Sawyer, on December 19, 2012. (*Id.* at 40-41). The consultation report for this visit indicates that Dr. Sawyer informed Wolfe of the high risk nature of his disease. Dr. Sawyer also discussed the role of post-operative irradiation, and explained that although some evidence suggested it improved both local control and the chances of long-term survival, there was no definitive proof of its efficacy. (*Id.*). Dr. Sawyer also noted that Wolfe was having continued problems with incontinence, and recommended that radiation therapy be delayed until this resolved. Given this, and also given Wolfe's high risk profile, Dr. Sawyer also recommended that he undergo androgen blockade therapy, a treatment designed to reduce the production of androgen, which stimulates the growth of prostate cells. Dr. Sawyer also explained that as long as Wolfe was on androgen blockade therapy, it would be reasonable to hold off on radiation therapy until his urinary function recovered. (*Id.*). Follow up visits with Dr. Greer, Dr. Whinnery, and Dr. Sawyer over the next several months also indicate that Mr. Wolfe was still suffering from incontinence in January and March of 2013. (Dkt. 17-5 at 43 & 46; Whinnery Aff. at ¶ 29). Mr. Wolfe received his first androgen treatment shot on January 8, 2013, and another one on April 11, 2013. (Whinnery Aff. ¶ 33). It was not until May 8, 2013 that providers first noted that his incontinence had improved. (Whinnery Aff. at ¶ 35; Dkt. 17-5 at 57-59). In the meantime, the androgen therapy

**MEMORANDUM DECISION** - 4

worked as desired, helping to bring Wolfe's PSA levels down to normal levels. (Dkt. 17-5 at 56-57).

On March 21, 2013, While Wolfe's was receiving androgen therapy, Dr. Whinnery submitted the outside providers' request for radiation therapy to the Corizon utilization review board. (Whinnery Aff. ¶ 31; Dkt. 17-16 at 22). In a report dated March 28, 2013, Dr. Richard Kosierowski, an oncologist employed by Corizon, denied the request for radiation therapy, stating that it was not the preferred method of therapy in a patient with Wolfe's presentation and that there was "no evidence that [it would] add anything to the patient's situation outside of complications of further incontinence/erectile dysfunction." (Dkt. 17-16 at 24). Dr. Kosierowski further stated that he felt that androgen blockade therapy or observation alone were the preferred methods of treatment for someone in Wolfe's situation. (*Id.*).

Dr. Whinnery saw Mr. Wolfe on April 8, 2013 and informed him that Corizon had denied the request for radiation therapy. (Whinnery Aff. ¶ 32). During this visit, Wolfe expressed his concern that this decision was based solely on financial considerations, and Dr. Whinnery advised him that she would discuss the issue with his local doctors to determine which treatment they felt would provide him with the best outcome. (*Id.*)

On April 16, 2013 Dr. Whinnery submitted another consultation request to Corizon, which explained that Wolfe's radiologists were of the opinion that radiation therapy offered best chance for a possible cure. (Dkt. 17-16 at 29). On May 8, 2013, Wolfe was seen by another radiologist, Dr. Joseph Brooks, who reviewed Corizon's denial of the request for radiation therapy and disagreed with Dr. Kosierowski's

**MEMORANDUM DECISION** - 5

conclusion that radiation therapy would not be efficacious. Specifically, Dr. Brooks stated that androgen deprivation therapy alone was "not a curative regimen," and that "radiation therapy in conjunction with hormonal therapy offers the only chance of a cure." (*Id.*). The office note for this visit also indicates that Mr. Wolfe's incontinence had improved at this time. In response to this information, Corizon approved the request for radiation therapy on May 22, 2013. Mr. Wolfe began radiation treatment on May 29, 2013. As of May 14, 2014, his cancer was in remission. (Whinnery Aff. ¶¶ 37 & 39).

Plaintiff filed suit on May 10, 2013, alleging claims against Corizon, the Idaho Department of Corrections, and several individual defendants. On August 19, 2013, the Court filed its Initial Review Order, holding that Plaintiff had not stated a colorable claim against the Idaho Department of Corrections or any of the individual defendants, but permitting him to proceed on claims for deliberate indifference and medical negligence against Corizon. This motion followed.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where a party can show that, as to a particular claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to

trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Rather, there must be no *genuine* dispute as to any *material* fact in order for a case to survive summary judgment. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Finally, material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

**MEMORANDUM DECISION** - 7

## DISCUSSION

### 1. Procedural Posture and Scope of Plaintiff's Claims

In its Initial Review Order, the Court stated that Wolfe could proceed with claims for deliberate indifference only against Corizon, based on his allegation that Dr. Whinnery had told him that "corporate headquarters" had denied his physicians' recommendations for radiation treatment. (IRO at 10). The Court also held that Wolfe could proceed with claims for medical negligence claims against Corizon, but did not delineate the parameters of the medical malpractice claim in the IRO. (*Id.* at 10-11). Accordingly, Corizon has provided briefing and evidence addressing *all* of Wolfe's allegations regarding the care and treatment he received from ISCI medical providers while undergoing treatment for cancer, not just those aspects of his care relating to the denial of radiation therapy.

While doing so may technically broaden the scope of Wolfe's deliberate indifference claims beyond what was suggested in the IRO, the Court will nevertheless address _all_ aspects of Wolfe's arguments as they relate to _both_ medical negligence and deliberate indifference. The Court does so for several reasons. First, doing so comports with the general tenet that pro se pleadings and motions are to be liberally construed. *See, e.g. Zichko v. Idaho,* 247 F.3d 1015, 1020 (9tth Cir. 2001).  Second, the more developed record on summary judgment reveals that the Corizon utilization review process was involved not only at the point where radiation therapy was requested, but throughout Wolfe's care and treatment for cancer. Third, this somewhat broader approach is not

prejudicial to Corizon, because it has had an opportunity to address, and indeed has addressed, all aspects of Wolfe's arguments challenging his medical care in its briefing and in the affidavit of Dr. Catherine Whinnery. No matter which aspect of the medical care is being considered, a careful review of the record reveals that there are no genuine issues of material fact on either the deliberate indifference or medical negligence claims, and that Corizon is entitled to summary judgment.

**2. Wolfe's Motion to Strike**

As a threshold matter, the Court will deny Wolfe's motion to strike Corizon's pleadings for untimeliness. (Dkt. 31). When the due date for a filing falls on a Saturday, Sunday, or legal holiday, filing on the next business day is considered timely. Fed.R.Civ.Pro. 6(a)(C). Accordingly, Corizon's corrected briefs and supporting materials were timely filed on March 30, 2015.

**3. Legal Standards for Deliberate Indifference and Medical Malpractice**

As explained in the Initial Review Order, (Dkt. 7), in order to create a genuine issue of material fact on a deliberate indifference claim against a private entity performing a government function, a plaintiff must point to evidence showing that the execution of an official policy or unofficial custom inflicted the injury of which the plaintiff complains. *Monell v. Dept. of Soc. Serv. of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037 (1978); *see also, Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities). Under *Monell*, the requisite elements of a § 1983 claim against a private entity such as Corizon are as follows: (1) the plaintiff must show that he was deprived of a constitutional right; (2) that the municipality or entity had

**MEMORANDUM DECISION** - 9

a policy or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001). Further, if the policy or custom in question is an unwritten one, the plaintiff must show that it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.1996).

In Idaho, in order to defeat a summary judgment motion on a claim for medical malpractice, a plaintiff must submit evidence tending to establish a genuine issue of material fact on each of the following elements: '(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage.'" *Jones v. Starnes*, 245 P.3d 1009, 1012, 150 Idaho 257, 260 (Idaho 2011) (quoting *Hansen v. City of Pocatello*, 184 P.3d 206, 208 (Idaho 2008)). Further, Idaho statutes require that a medical care provider's failure to meet the standard of care be proved by direct expert testimony. I.C. §§ 6-1012 & 6-1013. Specifically, section 6-1013 provides:

> The applicable standard of practice and such a defendant's failure to meet said standard must be established in such cases by such a plaintiff by testimony of one (1) or more knowledgeable, competent expert witnesses,

**MEMORANDUM DECISION** - 10

and such expert testimony may only be admitted in evidence if the
foundation therefor is first laid, establishing (a) that such an opinion is
actually held by the expert witness, (b) that the said opinion can be testified
to with reasonable medical certainty, and (c) that such expert witness
possesses professional knowledge and expertise coupled with actual
knowledge of the applicable said community standard to which his or her
expert opinion testimony is addressed.

I.C. § 6-1013. As a practical matter, this means that at the summary judgment stage as

well as at trial, a plaintiff must come forward with one or more expert witnesses, familiar

with the local standards of care, who can establish that a violation of those standards

occurred. Conjecture, supposition, and the unsupported assertions of persons lacking the

requisite knowledge of the standard of care are insufficient to defeat a motion for

summary judgment. Finally, though it is not explicitly stated in the Idaho Code, expert

testimony is also often required on the element of causation in medical malpractice cases,

given that "the causative factors are not ordinarily within the knowledge or experience of

laymen composing the jury." *Coombs v. Curnow,* 219 P.3d 453, 148 Idaho 129 (2009)

(*quoting Flowerdew v. Warner,* 409 P.2d 110, 113 (1965)).

Finally, while an entity like Corizon may be responsible for the negligence of its

employees under a theory of *respondeat superior* or vicarious liability, it may not be held

responsible for civil rights violation under section 1983 simply because it employs the

tortfeasor. *Monell,* 436 U.S. at 691; 98 S.Ct. at 2037; I.C. § 6-1012.

With these standards in mind, the Court concludes the care provided to Plaintiff from

the time the elevated PSA levels were detected in April of 2012 onwards neither fell

below the standard of care necessary to establish a medical malpractice claim, nor met

the exacting standards necessary to prove a deliberate indifference claim.

**MEMORANDUM DECISION** - 11

**4.   Propriety and Timeliness of Plaintiff's Overall Cancer Treatment.**

With the exception of several discrete issues that will be discussed below, Mr. Wolfe's complaints, broadly characterized, relate to the timeliness with which various treatments and therapies were obtained for him during the course of his treatment for cancer. In addition to challenging the initial denial of radiation treatment, Wolfe contends that by not providing prompt medical care throughout his cancer ordeal, Corizon allowed the Cancer to spread into other parts of his body. He asserts that this failure constituted both deliberate indifference to his serious medical needs and medical negligence. (Plaintiff's Brief at 5, Dkt. 30).

A careful review of the medical records does reveal the existence of a number of delays that occurred during the course of Mr. Wolfe's cancer treatment that may have been particularly frustrating to someone in his position. For example, once the elevated PSA levels were discovered in April of 2012, it was over two months before Plaintiff was first seen by the urologist, Dr. Greer, on June 27, 2012. Once he was seen by Dr. Greer, it took nearly four weeks for Corizon to approve the request for a biopsy. (Whinnery Aff., Dkt. 17-6 at ¶ 9). Then, once aggressive cancer was diagnosed on August 27, 2013, nearly three months elapsed before the surgery to remove it ultimately occurred on November 19, 2012. Unfortunately, at that point, the cancer had spread to Wolfe's lymph nodes, necessitating another round of treatment (radiation therapy) that he had hoped to avoid. After that, several more months elapsed before radiation treatment was ultimately approved by Corizon. It does not take a great imaginative leap to see why an incarcerated individual suffering from aggressive cancer, without any real agency over the timing of

**MEMORANDUM DECISION** - 12

his medical treatment, would become particularly frustrated by any delays—perceived or actual—in his treatment.

However, in order to defeat a summary judgment motion, a plaintiff must come forward with more than supposition and innuendo. In response to Wolfe's complaint, Corizon has submitted a detailed affidavit from Dr. Whinnery, the Medical Director at ISCI who saw Wolfe on numerous occasions during the course of his cancer treatment. As the Medical Director, Dr. Whinnery was responsible for reviewing the reports of outside providers and for submitting requests for treatment to the Corizon utilization review board. (Whinnery Aff. ¶ 1). Dr. Whinnery's affidavit establishes that at virtually every step of the way, the time frames involved in obtaining various referrals and getting various treatments approved was appropriate, and met or exceeded the standard of care. Dr. Whinnery also points out that, to some extent, the scheduling issues that arose in Mr. Wolfe's case depended on matters outside of the prison medical providers' control, such as the schedules of outside specialists. (*Id*. ¶ 42).

Dr. Whinnery explains that, because an elevated PSA level is not diagnostic for cancer, and given that Mr. Wolfe's digital rectal examination was normal, the amount of time it took to obtain a visit with an outside urologist was normal and within the standard of care. (*Id.*). The Court notes that Wolfe's visit with Dr. Greer was actually scheduled by May 9, 2012, though it did not occur until June 27, 2012. (*Id.*). The four weeks it took for Corizon to authorize a simple biopsy procedure does strike the Court as curiously long, given that Mr. Wolfe's age and his elevated PSA levels. However, the Court is not a medical expert and Dr. Whinnery also explains this amount of time met the standard of

**MEMORANDUM DECISION** - 13

care. She also notes that Dr. Greer did not order that the biopsy be performed on an expedited basis. (*Id.*).

Next, Dr. Whinnery opines that the time between when the biopsy results were reported and the surgery was performed met or exceeded the standard of care. (Whinnery Aff. ¶ 42). The reasons, Dr. Whinnery explains, were that certain tests needed to be performed to determine whether the cancer had spread, because these tests would help in determining the appropriate course of treatment. (*Id.*). Second, these tests did not show any spread of the cancer, and third, Dr. Greer's office never expressed any concern over the pace at which the tests were being obtained and treatment proceeding. (*Id.*). Wolfe has come forward no admissible evidence to rebut Dr. Whinnery's assertions that the care provided at ISCI, including the time it took to obtain various treatments and to schedule various procedures, met or exceeded the standard of care. Because Idaho statutes require expert testimony in medical malpractice cases, this failure is fatal to his negligence claims. It is also fatal to his deliberate indifference claims under *Monell.*

Besides his own testimony, Wolfe relies primarily on two affidavits in his opposition to Corizon's motion for summary judgment. One affidavit is from a former Corizon employee by the name of Dr. Ralph Heckard, which was submitted in connection with the case of *Balla v. State of Idaho,* 1:81-cv-01165-BLW, a class action lawsuit challenging the constitutionality of living conditions at ISCI, including the adequacy of  medical care. The second affidavit is from an inmate named Keith Brown, a class representative in the *Balla* case. The Heckard affidavit, which dates from 2010, describes a cumbersome utilization review process that requires ISCI physicians to

**MEMORANDUM DECISION** - 14

submit separate treatment requests to Corizon for each and every step of a cancer patient's treatment. (Dkt. 30-3 at p. 3-5). Mr. Brown's affidavit is somewhat more general, but also asserts that delay in obtaining treatment for cancer patients is an ongoing problem at ISCI. (*Id.* at p. 11-13).

Wolfe's intention in submitting these affidavits was presumably to suggest there was a pattern and practice of substandard care at ISCI, particularly with regards to the timeliness of cancer treatment, that would fit within the *Monell* framework. However, even if the Court were to accept these affidavits as evidence that Corizon maintains an overly burdensome utilization review process for purposes of establishing the pattern and practice element of a *Monell* claim, Plaintiff still would have to show that the specific care he received was so substandard that it amounted to the deprivation of a constitutional right. *See, Mabe v. San Bernardino Cnty.*, 237 F.3d at 1110-11. However, Wolfe has not been able to come forward with any admissible evidence showing that the care he received was actually substandard. If he cannot establish negligence, it follows that he cannot meet the even more exacting standards of a deliberate indifference claim. Mr. Brown's affidavit does include some minutes from the case monitoring meetings in *Balla* in which Mr. Wolfe's cancer treatment was apparently discussed. These minutes indicate that both another class representative and an attorney (whose role in the proceedings was not clear) did express some concerns with the length of time it was taking for Mr. Wolfe to get his treatment. (Dkt. 30-4 at p. 19). However, opinions from laypersons without any medical expertise or demonstrated familiarity with the local standard of care are not

**MEMORANDUM DECISION** - 15

admissible, and not sufficient to rebut Dr. Whinnery's opinion that the care Mr. Wolfe received was adequate.

Alternatively, Wolfe's claims also fail on the element of causation. Central to his claims is the notion that his cancer would not have spread beyond the prostate gland had it been caught and treated earlier. In support of this argument, Wolfe asserts that he was told, after his surgery, that the cancer would not likely have spread beyond his prostate had the surgery been performed when the cancer was first discovered. (Dkt. 30-1 at ¶ J). However, the out-of-court statements of an unidentified medical provider are hearsay and are not admissible. Fed. R. Evid. 801(c). Thus, the only evidence the Court can consider on this point is Dr. Whinnery's opinion that it is *not* possible to say within a reasonable degree of medical certainty when the cancer spread beyond his prostate.[2] Along these same lines, there is no evidence in the record to support Wolfe's assertion that he had a PSA test done in 2011. The document Wolfe references in support of this argument (Dkt. 30-4 at 25) simply indicates that Wolfe had some lab work and x-rays done in February of 2011. This document does not say whether a PSA test was done at that time. Further, his medical records indicate that Wolfe refused a prostate examination in 2011. (Dkt. 17-17 at 46). Thus, Wolfe's claim that he may have had an elevated PSA level as early as 2011 is speculative at best.

---

[2] The Court does note that the pelvic scan performed in September of 2012 actually showed there was no evidence of metastasis. However, the Court is not a medical expert and has no knowledge of how accurate such scans are at detecting cancer in the lymphatic system.

**MEMORANDUM DECISION** - 16

5. **Timeliness of Radiation Therapy**

Corizon is also entitled to summary judgment on those aspects of Wolfe's claims having to do with the initial denial of radiation treatment. The reason for this initial denial was that the reviewing oncologist, Dr. Kosierowski, felt that radiation therapy was not of any proven benefit to patients with Wolfe's presentation, and would only increase the risk of side effects. However, when Dr. Brooks responded to this denial, explaining that radiation treatment offered the only possible chance for a complete cure of his cancer, Corizon reversed this decision and Wolfe ultimately received the therapy. The medical evidence is also in agreement that as long as Wolfe was experiencing problems with incontinence, the preferred course of treatment was to hold off on radiation therapy and continue androgen deprivation therapy.

A mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay causes further harm. *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), overruled on other grounds by *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc). Crucially, both Dr. Sawyer and Dr. Whinnery agreed that as long as Wolfe was receiving androgen blockade therapy, it was reasonable to hold off on radiation therapy. (*Id. See also,* Whinnery Aff. ¶ 25). On these facts, the Court cannot conclude that the initial decision by Corizon to deny radiation therapy was "medically unacceptable under the circumstances" or "chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (alteration omitted) (*quoting Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). ). It is also important to remember that even before Corizon denied the request for

**MEMORANDUM DECISION** - 17

radiation treatment, Dr. Greer had warned Wolfe of the controversial nature of radiation therapy and explained that its efficacy had not been proven. Given this evidence, the Court cannot conclude that Corizon's initial decision to deny a controversial treatment amounted to deliberate indifference.[3]

Corizon is also entitled to summary judgment on the medical negligence claims arising from the denial of radiation therapy. First, the absence of an affidavit from a qualified expert witness on the issue of radiation therapy requires that the Court dismiss these claims. Second, even if Wolfe could somehow demonstrate a material issue of fact on the standard of care, his case would still founder on the elements of causation and damages, because the medical providers all agreed that Wolfe could not have received radiation while he was still experiencing incontinence. The delay occasioned by the utilization review process was negligible at best and did not appear to cause any further harm. And, as July 2014, Wolfe's cancer has been in remission.

---

[3]Wolfe also suggests that by submitting the decision on whether he would be allowed radiation therapy to an out-of-state physician, Corizon was, in effect, practicing medicine without a license. (Dkt. 30 at p. 4). Idaho courts do not appear to have addressed the question of whether utilization review constitutes the unauthorized practice of medicine, and Corizon has not specifically addressed this issue in its briefs. However, the Court notes that the Idaho Medical Practice Act does allow for physicians licensed in other states to consult with Idaho physicians regarding the care of patients in Idaho. I.C. § 54-1804(b). In any event, even assuming for the sake of argument that Corizon's utilization review process somehow did constitute the unauthorized practice of medicine, Wolfe has still failed to come forward with any admissible evidence that any actions or omissions attributable to Corizon caused him harm.

**MEMORANDUM DECISION - 18**

6. **Propriety and Timeliness of Care Provided in Connection with Biopsy and Hormone Therapy.**

Wolfe also challenges two additional discrete aspects of the care he received while undergoing cancer treatment at ISCI. The first relates to a septic infection that he developed after the biopsy was performed on August 22, 2012. Primarily, he argues that the medical team at ISCI caused the infection by failing to provide him with an enema and pre-operative antibiotics. However, Dr. Whinnery's affidavit establishes that the office note from Dr. Greer indicating the need for a pre-operative enema and antibiotics was not even provided to the prison medical team until this litigation had commenced. (Whinnery Aff. ¶ 43). She also notes that, since Dr. Greer administered Gentamicin at the time of the biopsy, a preparatory dose of antibiotics would have been unnecessary. (*Id.*).Wolfe also claims that after the biopsy, ISCI providers failed to fill a prescription for post-operative Levaquin from Dr. Greer, and instead gave him a pill left over from another patient. However, Dr. Whinnery's affidavit and the corresponding medical records indicate that Wolfe was simply provided with Levaquin from the infirmary stock. Wolfe has not come forward with any evidence tending to show that this infection was caused by any breach of the standard of care on the part of the ISCI medical team.

Next, Wolfe challenges the administration of the androgen blockade therapy—also referred to as Trelstar injections—that he received beginning in January of 2013. Essentially, he alleges that in a post-surgical follow up appointment with Dr. Sawyer, a nurse was on the point of giving him his first Trelstar injection, when that person was told by an IDOC employee that such injections were something that should be

**MEMORANDUM DECISION** - 19

administered at the prison. Because of this conversation, Dr. Sawyer's nurse did not give Wolfe the Trelstar shot on December 19, 2012. However, when Plaintiff returned to the prison, he was informed that the request for Trelstar still had to go through "corporate headquarters." (Wolfe Aff. Dkt. 30-1, p. 4-6). Dr. Whinnery's affidavit confirms that the request for androgen blockade therapy did have to go through Corizon's utilization review process; however, the therapy was approved and Wolfe was administered his first Trelstar injection on January 8, 2013. (Dkt. 17-5 at pp. 56-57). Wolfe has failed to submit any evidence that would suggest that the manner in which the Trelstar injections were handled either violated the standard of care or constituted deliberate indifference on Corizon's part. Further, on May 8, 2013, Dr. Brooks noted that Wolfe's post-operative PSA levels had persistently been 1.13, well within the range of normal. (Dkt. 17-5 at p. 56). According to Dr. Whinnery, these findings mean that the androgen therapy served its intended purpose and the slight delay occasioned by the utilization review process had no adverse effect. (Whinnery Aff. ¶ 47).

Wolfe also alleges that on April 8, 2013, while attempting to administer his second Trelstar injection, a nurse at ISCI dropped both syringe and the bottle of liquid hormone on the floor. Wolfe further alleges that this nurse attempted to re-use the liquid hormone after it had fallen. (Wolfe Affidavit, Dkt. 30-1, p. 7). However, according to Wolfe's own affidavit, he filed a concern form over this issue and was told that the nurse would be trained better. An individual act of negligence or even recklessness cannot be attributed to Corizon for purposes of a deliberate indifference claim. (*Id.*). *Monell,* 436 U.S. at 691; 98 S.Ct. at 2037. Further, nothing in the record suggests that this incident caused Mr.

**MEMORANDUM DECISION** - 20

Wolfe any harm, so the medical malpractice claims fail as well. In fact, Dr. Whinnery

testified that she saw Wolfe on April 8, 2013. and he informed her that he had *not*

received his Trelstar injection. (Whinnery Aff. ¶ 32) He ultimately received one three

days later. (*Id.* ¶ 47). And, as explained above, the androgen therapy worked as desired,

helping to bring down Wolfe's post-surgical PSA levels to within normal limits.

### 7.  Additional Allegations

Wolfe's remaining allegations—that he was improperly required to make a co-

payment for doctor visits at ISCI even though his cancer was a chronic condition, denied

incontinence counseling, denied medication for a rash in his groin area, and denied the

right to sleep on the bottom bunk even though it was medically necessary—are all

without merit.  As to the co-pay issue, the unrefuted evidence in the record states that

while prison officials may take a co-pay out of an inmate's bank account, inmates are

never denied medical care over the issue of a co-payment. (Whinnery Aff ¶ 51). As for

the rash, there is no admissible expert evidence to refute Dr. Whinnery's opinion that this

minor medical condition was handled appropriately. Nor has Wolfe come forward with

admissible medical testimony explaining how the lack of continence counseling violated

the standard of care or constituted deliberate indifference to his serious medical needs.

Finally, while it somewhat unclear if Wolfe was actually denied a bottom bunk for a

period of time, the facts Wolfe has presented fall far short of establishing a claim for

deliberate indifference on this issue. There are also no facts suggesting that the denial of a

bottom bunk caused him any harm, if indeed he was ever denied one at all. The evidence

**MEMORANDUM DECISION** - 21

in the record on these issues fails to create a genuine issue of material fact as to either medical negligence or deliberate indifference.

## ORDER

1.   Plaintiff's Motion to Strike (Dkt. 31) is  **DENIED.**

2.   Defendant's Motion for Summary Judgment (Dkt. 28) is **GRANTED.**

DATED: July 21, 2015

Edward J. Lodge
United States District Judge

**MEMORANDUM DECISION -** 22